UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :  No. 3:17CR234(JAM)
                                 :
          v.                     :
                                 :
EDDIE CHAN,                      :
                                 :  New Haven, Connecticut
                Defendant        :  May 1, 2018
                                 :
- - - - - - - - - - - - - - - - x
```

SENTENCING

BEFORE:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

FOR THE GOVERNMENT:

OFFICE OF THE UNITED STATES ATTORNEY
157 Church Street, 25th Floor
New Haven, Connecticut 06510
BY:  DAVID J. SHELDON, AUSA

FOR THE DEFENDANT:

OFFICE OF THE FEDERAL DEFENDER
10 Columbus Blvd., 6th Floor
Hartford, Connecticut 06106-1976
BY:  ROSS DANIEL THOMAS, AFD

Diana Huntington, RDR, CRR
Official Court Reporter

1                           **10:08 A.M.**

2              THE COURT:  We're here today for sentencing in

3    the matter of United States of America v. Eddie Chan.

4              May I have appearance of counsel, please.

5              MR. SHELDON:  Good morning, Your Honor.  May it

6    please the Court, David Sheldon, Assistant United States

7    Attorney, on behalf of the government.  Seated next to me

8    at counsel table is Special Agent Geoffrey Cook of the

9    Internal Revenue Service Office of Criminal Investigation.

10             THE COURT:  Good morning.

11             MR. THOMAS:  Good morning, Your Honor.  Ross

12   Thomas from the Federal Defender's Office on behalf of

13   Eddie Chan who is seated to my left.  Also in the

14   courtroom today is Ms. Leung, Mr. Chan's wife.

15             THE COURT:  And Mr. Chan, are you okay today,

16   sir?

17             THE DEFENDANT:  Sorry?

18             THE COURT:  Are you okay today, sir?  Do you

19   feel okay?

20             THE DEFENDANT:  I'm okay.

21             THE COURT:  Okay.

22             So on October 26, 2017, Mr. Chan appeared before

23   the Court for purposes of waiving indictment and entering

24   a plea of guilty to a charge of making and subscribing to

25   a false tax return in violation of 26 U.S.C. 7206(1).

 1          A Presentence Report has been prepared in the

 2    case by our probation officer, Michael Jones, who is here

 3    in the courtroom today.

 4          And Mr. Chan, I want to discuss with you what

 5    I'm going to cover during today's sentencing.

 6          The first thing is I'm going to review some

 7    fairly technical matters, mostly with the lawyers.

 8          After I'm done with that, I'll turn it over to

 9    your counsel to make any kind of argument on your behalf

10    that he'd like to make.  You are welcome, if you'd like

11    to, or if your wife would like to and you'd like her to,

12    to make a statement to the Court.  And then after that's

13    concluded, I'll hear from the government.

14          And then, Mr. Thomas, if you want to respond to

15    anything that the government said, you're welcome to do

16    that as well.

17          I'll probably take a brief recess after that to

18    consider all that I've heard before turning to the

19    imposition of sentence, okay, Mr. Chan?  Do you understand

20    that, sir?

21          THE DEFENDANT:  Yes.

22          THE COURT:  In terms of what I've looked at in

23    the case, I've looked at everything that's been filed on

24    the docket in the case.  Of course, that principally

25    includes the Presentence Report and all the related

1    materials with the Presentence Report as well as the

2    parties' sentencing memoranda and the supplemental

3    sentencing memo that Mr. Thomas filed as well.

4                Is there anything else the parties think I

5    should have reviewed?

6                MR. SHELDON:  No, Your Honor.

7                MR. THOMAS:  No, Your Honor.

8                THE COURT:  And Mr. Chan, have you reviewed the

9    Presentence Report with your counsel?

10               THE DEFENDANT:  Yes, I have.

11               THE COURT:  And discussed it with him?

12               THE DEFENDANT:  Yes.

13               THE COURT:  At this point in time, are there any

14   factual objections by any party to the statements set

15   forth in the Presentence Report?

16               MR. THOMAS:  No, Your Honor.

17               MR. SHELDON:  No, Your Honor.

18               THE COURT:  And with respect to the Presentence

19   Report -- please be seated -- with respect to the

20   Presentence Report's calculation of the Sentencing

21   Guidelines, it looks like it calculates a final offense

22   level of 13 and a criminal history category of I.

23               Under that calculation, that would lead to a

24   recommended range of imprisonment between 12 to 18 months.

25   And insofar as there's also a request for an alternative

1    sentence of probation, the recommended range would be

2    between one to five years of probation.

3         The term of supervised release that might follow

4    any term of imprisonment would be up to I believe it's

5    just one year -- is that correct, Mr. Sheldon?

6         MR. SHELDON:  Yes, Your Honor.

7         THE COURT:  -- for this particular offense.

8         And then there would be a $3,000 to $30,000

9    recommended criminal fine range.

10        I believe the parties have agreed to restitution

11   as to the Internal Revenue Service of an amount of

12   $78,214.

13        And then I believe I'm required to impose the

14   $100 special assessment.

15        Do I have all those numbers right?

16        MR. SHELDON:  You do, Your Honor.  In the plea

17   agreement the government agreed to move for additional

18   one-level downward departure.

19        THE COURT:  I'll grant that.

20        MR. SHELDON:  So we're down to level 12.

21        THE COURT:  That gets you down to level 12, is

22   it?

23        MR. SHELDON:  Yes, Your Honor, as stated in the

24   plea agreement.

25        THE COURT:  Okay.  I may have misunderstood

1    that.

2              Is that right, Mr. Thomas?

3              MR. THOMAS:  Yes, that's right.

4              THE COURT:  Okay, great.  Thank you for that

5    correction.

6              So I'll modify what I think is the applicable

7    final offense level, consistent with the parties' plea

8    agreement, to be level 12 and a 10- to 16-month

9    recommended range of imprisonment.  Okay.

10             So if there's no other objections to the

11    Presentence Report's guidelines calculations --

12             MR. SHELDON:  No other objection, Your Honor.

13             MR. THOMAS:  No, Your Honor.

14             THE COURT:  -- I'll adopt those as well.

15             So I think that's it for the technical matters.

16             Mr. Thomas, would you like to proceed?

17             MR. THOMAS:  Yes, Your Honor.

18             In many ways --

19             THE COURT:  Come on up to the lectern if you

20    don't mind, sir.

21             MR. THOMAS:  Not at all.

22             In many ways this case is different from your

23    typical tax case.  Mr. Chan isn't someone that failed to

24    file because he thought taxes were for suckers or that the

25    government didn't deserve what he made.  This case is also

1    different because what's motivating it is not greed.  This

2    case is fundamentally about mental illness and

3    pathological gambling.

4            Now, Mr. Chan has been a problematic or a

5    pathological gambler for the last 40 years.  As he wrote

6    in his letter, this started when he was about 17 years

7    old.  But despite suffering from this addiction for four

8    decades, he has managed to build a successful career.  He

9    has a loving wife, he has a 16-year-old daughter, he also

10   has loyal friends; pretty much everything his parents

11   wanted for him when they came to the United States many

12   years ago.  But despite all of this, he's still suffering

13   from this addiction.  There are various points in his life

14   where it may lay dormant, but it comes back again.

15           And it makes me think about an article I read in

16   the *New York Times* a couple months ago about lawyers

17   suffering from mostly alcohol and drug addictions where

18   there are these very high-functioning people who are like

19   partners in law firms but are getting by only because they

20   keep fueling this addiction.  But because they're

21   successful, people don't notice it.  In many ways, this is

22   almost worse than someone where it becomes immediately

23   apparent, because people don't ask questions about what's

24   happening because everything looks fine.  But the problem

25   is after 40 years, you get deeper and deeper into an

1    addiction and it becomes harder to break.  And all of the

2    consequences of that addiction build and build and build.

3    And that's exactly what we have happening here.

4          Mr. Chan first starts off maxing out his credit

5    cards, getting other types of loans.  When that doesn't

6    pan out, he gets a loan from his employer.  And in the

7    beginning, these were legitimate loans from Michael

8    Altman.  After a while, Michael Altman cuts him off.  And

9    that's when we kind of get to the heart of this case.  He

10   starts taking money without approval.  He's recording it

11   as loans, because he really does believe he's going to pay

12   this back.  And that's one of the things Michael Altman

13   actually says in his letter, and in my discussions with

14   him, he wanted to make clear that Eddie did really believe

15   he was going to pay this back and he wouldn't have done it

16   in the way that he did if he had no intention.  And he

17   very well could have run off with a lot more money,

18   because there's a lot of money at stake in this very small

19   business.  Tens of millions if not $100 million coming

20   in --

21          THE COURT:  So when you say he believed he was

22   going to pay it back, was he essentially deluded about

23   that by his sickness?

24          MR. THOMAS:  I believe so, by the sickness.

25          And that's also something consistent with what

1    his treatment provider is saying.  She finds that in a lot

2    of people she treats that, you know, they have deluded

3    themselves into thinking that these are loans or I just am

4    this close to winning and everything is going to be fine.

5          THE COURT:  So there's a delusion about really

6    two things or related things.  There's a delusion that one

7    is going to pay it back, but there's also the sickness, I

8    take it, leads one to do something that's secret and

9    unknown to the employer, right?

10          MR. THOMAS:  I would agree with that.

11          THE COURT:  In terms of engaging in these --

12    essentially it's theft.  And just stealing the money

13    without obviously telling the employer and, in fact,

14    contrary for this particular employer to his express

15    command that he not receive any more, quote/unquote,

16    loans, right?

17          MR. THOMAS:  That's true.  And that's why it's

18    wrong.  But at the same time, the pathological gambling is

19    contributing to this offense.

20          And then even after Mr. Chan is approached by

21    agents who notice kind of a lot of withdrawals in his bank

22    account, a lot of money being moved, which is a result of

23    the gambling, he's moving money in and out on a frequent

24    basis because he runs out when he's at the OTB and he's

25    got to go to the ATM.  So it looks suspicious and then

1    they pick up on other things that there's money that may

2    not have been declared on the taxes.  Initially Mr. Chan

3    describes this as a bonus but, to his credit, he very

4    quickly realizes what he said was not true and he called

5    the IRS agents back and he said, "You know, what I told

6    you wasn't exactly accurate."  I think he deserves some

7    credit for that.

8        Afterwards, he goes and reports to Michael

9    Altman and tells him what happened.  And again, I think

10   that takes a lot.  Yes, the government had already been

11   investigating and his back was against the wall, but he

12   did what was right in that moment.

13       The other point I'm getting at about long-term

14   addiction is that it doesn't go away very easily.  One of

15   the things that the government has talked about, and

16   they're right, is Mr. Chan continued to gamble after he

17   was approached by these agents.  And he also continued to

18   engage in loans, which was not criminal conduct, but

19   not -- probably not what he should have been doing.  He

20   was, of course, out of work at that point and down on his

21   luck.  But he was still gambling.

22       But again, his treatment provider talks about

23   this as not being unusual for people that have this

24   disease and people that have suffered from this disease

25   for a really long time.  What she would see in her

1   patients and indeed with Mr. Chan is that there's a

2   resistance to thinking that this is a problem, resistance

3   to thinking that they need to stop.  Again, this is very

4   similar to people suffering from different types of

5   addiction.

6           One of the cases that I cited, *United States v.*

7   *Maier*, which is the Second Circuit case about substantial

8   rehabilitation, in that case --

9           THE COURT:  I'm very familiar with that case.

10  No need to recite.

11          MR. THOMAS:  It is strikingly similar.  And the

12  point of that is that our efforts at rehabilitation don't

13  have to be perfect, that what can happen is that we have a

14  lot of false starts, but really we're on an upward

15  trajectory now where Mr. Chan has excluded himself from

16  all of the gaming establishments in Connecticut and in

17  New York.  And I went back to check that those all do

18  include the OTBs as well as casinos, which is not his

19  primary source of gambling.

20          THE COURT:  What about internet gaming?

21          MR. THOMAS:  I don't know, Your Honor, off the

22  top of my head whether that includes internet gaming.

23          In addition to kind of this upward trajectory

24  about --

25          THE COURT:  Is that another concern, though,

1    that I have to be thinking about?  We have, as in your own

2    words, it's a pathological disorder, so that in a way and

3    as you've said, I think, it doesn't go away easily.  Those

4    are your words.  So don't I have to be concerned that to

5    the extent that he may refrain from going to OTB

6    establishments and the like, he could just be getting

7    online and satiating this pathological desire to gamble,

8    or at least that's a concern.  I know we don't have

9    evidence -- it sounds like we don't have evidence of that.

10   Shouldn't that be a concern at this point?

11         MR. THOMAS:  I think that you're right to flag

12   that as a concern.  The way that we -- the question is

13   really how do we address that.  And I would submit that in

14   conjunction with excluding himself from the normal ways in

15   which he would be triggered, we also can -- you can order

16   and have the authority to order he continue his

17   participation in treatment.  And by meeting with his

18   counselor on a weekly basis, the Court can ensure that he

19   is not going to relapse.  The problem for him before --

20         THE COURT:  I can't ensure that, right?  I can

21   ensure that maybe he goes and meets with his counselor,

22   right, but he was relapsing even after he was back -- when

23   he started counseling.  He kept gambling right until

24   November 2017, right?  He's been "dry" from gambling only

25   since November 2017, right?

1          MR. THOMAS:  That's true.

2          In addition to his --

3          THE COURT:  And I take it I can order him not to

4    engage in any gambling --

5          MR. THOMAS:  You can.

6          THE COURT:  -- during any period of supervised

7    release or probation, right?

8          MR. THOMAS:  You can do that and you can punish

9    him if you do find that.  And he will be meeting with his

10   probation officer, they will also do financial assessments

11   to figure out where the money is going.  So there will be

12   an easy way to track this if he is engaging in it and

13   there will be a way to punish him.

14          In addition to the gambling piece of this, he

15   has been making payments to the people that he owes money

16   to.  Most notably, he has paid a substantial amount of

17   money to Michael Altman.  He's liquidated his retirement

18   savings.  He also provided I believe it was $18,000 to

19   him.  He also has debts to both the federal government and

20   the Connecticut state government, he's on payment plans.

21   I believe the newest payment plan that he's proposed with

22   the federal government is $700 a month.  The one with --

23   $600 a month for federal and $700 state.  He has about

24   $9,000 left on the state.  So he's made substantial

25   payments throughout these last two years.  He has also

1    paid about $6,000 back to the OTB employee that is

2    referenced in the government's memorandum.  He has also

3    made a recent payment of $500 to Richard Cantale, who is

4    the friend referenced in the government's, but it's also

5    the person who wrote a letter on his behalf.  And he's

6    about halfway through paying back the hotel owner, I think

7    he has about $2500 left.  So he has been working to save

8    money to pay back the people he owes money to.

9              THE COURT:  Okay.

10             MR. THOMAS:  So what we've proposed is a

11   sentence of probation.  I think there are a couple of

12   different ways we can get there.

13             One, I think there's a way under the guidelines

14   where we can say the downward departure to Zone B

15   accomplishes a specific treatment purpose, which is the

16   treatment for the gambling.  And once you're in Zone B, a

17   sentence of probation would be appropriate.

18             The government has also suggested that the most

19   important factor here is (A)(7), which is the need to pay

20   restitution.  Mr. Chan has been making restitution, and

21   keeping him out and employed is the best way to facilitate

22   that.  There is a substantial amount of money at stake.  I

23   think it would be very difficult for him to pay it all

24   back, but the alternative where he loses his employment,

25   comes out as a nearly 60-year-old man trying to find work

```
 1   again is going to be very difficult.  And even if he does

 2   find work, it's not going to be at the same level that

 3   he's currently at.

 4            THE COURT:  Tell me, what is the current state

 5   of employment?

 6            MR. THOMAS:  The current state of employment is

 7   he works for several different organizations where he

 8   works as a bookkeeper.  I can let him speak on behalf of

 9   what he's doing.

10            THE COURT:  Okay.

11            MR. THOMAS:  The other point about probation I

12   want to be clear about is in many ways probation can be

13   more severe than a sentence of imprisonment in a couple

14   different ways.  One, the total amount of time in which he

15   can be supervised is longer on probation.  Probation can

16   be up to five years.  Here, the maximum sentence of

17   imprisonment is three years followed by one year of

18   supervised release.  Those combined are less.  If he

19   violates probation, the sentence of imprisonment can be up

20   to three years as opposed to if he violates a term of

21   supervised release.  So, again, we can wind up back here

22   and there's a significant punishment hanging out over his

23   head.

24            And the other thing I was less clear about in my

25   sentencing memorandum is probation can be imposed for the
```

1    purpose of punishment.  Unlike supervised release where it

2    omits the purpose of sentencing talking about punishment,

3    probation does not.  So the conditions and the purpose of

4    it can be crafted with punishment in mind.  I'm not

5    suggesting any additional punishment, but that is

6    something to be aware of.  I think it reflects on we've

7    objected to Condition 6 that the Probation Department has

8    imposed.  One of the reasons is essentially this is a

9    scarlet letter.  I think if it were probation, you could

10   think about it, although I would object to it for not

11   being reasonably related to the offense or that it is

12   unconstitutionally vague, whether probation or supervised

13   release.

14           THE COURT:  Is one of my jobs under the statute

15   3553 to be concerned about protecting the public from

16   further crimes?

17           MR. THOMAS:  Yes, it is.

18           THE COURT:  So you have somebody here who, by

19   your description, is a pathological gambler, doesn't go

20   away easily, it's been a lifelong issue for him.  Although

21   he is not -- does not have criminal history, he's not a

22   criminal recidivist, he is a gambling recidivist, right,

23   because he's had times, even by his own acknowledgment and

24   his own letter to the Court, where he addresses issues and

25   then relapses.  He's very secretive, right, from what we

1    know.  His wife didn't know about, according to the

2    Presentence Report, the extent of what he was doing even

3    just until about the time that he pled guilty last

4    October.

5             When you combine all of those and a track record

6    of having taken hundreds of thousands of dollars from an

7    employer here, I can't see how it would be consistent with

8    serving the purposes of protecting the public not to

9    require notification to employers, any employers who trust

10   him in some manner with financial activities of some sort

11   in which he might have access to financial institutional

12   assets or access to confidential financial information,

13   essentially access to financial assets or assets in

14   general that could be used for purposes of perpetuating

15   his pathological gambling disorder that you told me about.

16   You've said one of the hallmarks of this disorder is self

17   delusion, right?  It's dishonesty and then it's wild

18   notions that somehow you're going to pay back money that

19   you started taking from an employer who doesn't know the

20   money is being taken.

21             So that's a real concern for me here.  I have to

22   say I'm very concerned about the idea that Mr. Chan could

23   be working for it sounds like three employers in a

24   bookkeeping financial kind of capacity and those employers

25   are oblivious, oblivious, as far as I can tell, to the

1   risk, the very real risk that's posed here by Mr. Chan.

2   It's an unfortunate one.

3         So I have a real concern about imposing a

4   sentence that would essentially not serve the protection

5   of the public because it would leave these employers at

6   risk there who are trusting Mr. Chan.  It's a real concern

7   for me.  I don't know how to say it otherwise.

8         I realize that there might be an interest in

9   saying, well, maybe these employers are not going to

10  continue to employ him if they learn the truth, but I have

11  to think that's something for them to make a decision

12  about, not for Mr. Chan to make a decision about, not for

13  the one who has already stolen money from an employer and

14  not reported it on tax returns.  So that's -- I have a

15  real concern about that.

16        I'm wondering what your response to that is.

17  Why shouldn't the employer know?  Why shouldn't the Court

18  impose the following condition, simply that the United

19  States Probation Office require Mr. Chan to advise the

20  Probation Office of any employer for whom he is working in

21  any kind of financial capacity, and then that the United

22  States Probation Office shall furnish to that employer the

23  copy of the charge, the copy of the plea agreement along

24  with its stipulation of offense conduct, and a copy of the

25  judgment and conviction order in this case?  And so the

1    employer then can make a determination after due

2    consideration of whether Mr. Chan should continue to be

3    employed there.  The notification could be delayed for a

4    suitable period of time to the extent that Mr. Chan would

5    wish to broach the subject as an initial matter with the

6    employer, but my inclination is to impose a condition akin

7    to that type of condition.  To the extent that it's

8    objected to, I would not impose it today as part of the

9    sentence because it's not a specific condition that you've

10   had notice of.  You've had essentially notice of a

11   different related condition from the Probation Office that

12   the probation officer would make its own independent

13   determination of risk here.  I'm not going to make the

14   financial -- the Probation Office makes that, I can make

15   it, right?  It's like a huge big red flashing light in

16   this courtroom strobing away saying this person is an

17   imminent risk to take employer's money.  So I think

18   there's a very high level of risk.  And then the question

19   is what's an appropriate response to that.

20          So if you have any initial thoughts about why

21   that would be unconstitutional or impermissible or

22   unreasonable in any manner, I would welcome hearing from

23   you on that.  But of course to the extent that you would

24   object to such a condition, I'll allow you to submit any

25   kind of objection in writing before imposing that specific

1     condition.

2              MR. THOMAS:  Why don't I review that with

3     Mr. Chan and we will let you know.

4              THE COURT:  Sure.

5              MR. THOMAS:  In sum, Your Honor, I don't

6     disagree and we don't disagree with what the government is

7     saying about tax offenses.  They are certainly serious and

8     in many cases they warrant a term of incarceration because

9     our tax system relies on honest compliance.  What we're

10    saying is not that this is not a bad offense or all tax

11    offenses really should be in the manner of probation.

12    What I am suggesting is Mr. Chan is very different from

13    most people committing this offense.  And what makes him

14    different is essentially his addiction, all the things

15    that he's done to treat that, the need to pay restitution,

16    all of these factors remove him from the ordinary person

17    under the guidelines.  And for that reason, I think

18    probation here makes sense.

19             Unless you have any further questions,

20    Mr. Chan's wife will rely on her letter, but Mr. Chan

21    would like to say a few things.

22             THE COURT:  Certainly.  Thank you.

23             Mr. Chan.

24             THE DEFENDANT:  Your Honor, I heard everything

25    you said, your input.

1          I do apologize for what I've done.  I never had

2    this intention to be the person that I am.  I feel

3    remorseful.  I started making amends to the people that I

4    harmed, seeking therapy.

5          And but, you know, listening to what you said

6    about notifying my employers, you know, I'm 58 years old.

7    I don't think I have too many more chances of making

8    restitution without employment, sir.  You know, just from

9    a common sense standpoint, if my employer gets these

10   notifications, you know, what would be the immediate

11   reaction, Your Honor?

12          And most of my employers I don't have access to

13   actual monetary movement of monetary proceeds, okay.  It's

14   more strictly bookkeeping on a QuickBooks software.  So

15   there is no access for me to move funds around.

16          But I certainly, you know, feel terrible what

17   I've done.  And I would like to have an opportunity to,

18   you know, make amends to those that I've harmed,

19   Your Honor.

20          THE COURT:  So when you talk about -- you say

21   most of your employers you don't have access, I think I

22   heard you say that.

23          THE DEFENDANT:  All of them.

24          THE COURT:  So let me go one by one.  Who are

25   your employers?  Imian Partners, right?

1           THE DEFENDANT:  Imian Partners.

2           THE COURT:  Is that your major employment now?

3           THE DEFENDANT:  Yeah.  They have two business

4  there, real estate development business and hospitality

5  business.

6           THE COURT:  Okay.  And what is your job there?

7  What's your job title with Imian Partners?

8           THE DEFENDANT:  Bookkeeper.

9           THE COURT:  Are you the only bookkeeper or is

10 there somebody else?

11          THE DEFENDANT:  They have accountants that, you

12 know, look at the financials, quarterly and year end.

13          THE COURT:  All right.

14          And then for Silver Leaf Capital, that's another

15 company you're working for?

16          THE DEFENDANT:  Correct.

17          THE COURT:  What's your job responsibility

18 there?

19          THE DEFENDANT:  Bookkeeper.

20          THE COURT:  And there's another company, R.I.S.,

21 Inc.?

22          THE DEFENDANT:  Correct.

23          THE COURT:  What's your responsibility there?

24          THE DEFENDANT:  Bookkeeper.

25          THE COURT:  And how much time are you spending

1    working with Silver Leaf and R.I.S.?

2              THE DEFENDANT:  Silver Leaf, one day a week for

3    five hours.

4              THE COURT:  Okay.

5              THE DEFENDANT:  For Imian, that's because I do

6    their work for both businesses, spend about 30 hours, 35

7    hours.

8              THE COURT:  Okay.

9              THE DEFENDANT:  And for R.I.S., I spend about 20

10   hours, 15 to 20 hours.

11             THE COURT:  Right, right.  Okay.

12             THE DEFENDANT:  That's the makeup of my work.

13             THE COURT:  You have that employment.

14             Obviously, you have a daughter who it sounds

15   like is about to go to college probably?

16             THE DEFENDANT:  She's a year removed from

17   college.

18             THE COURT:  Sure, great.  And your spouse is

19   working full-time, I know.

20             THE DEFENDANT:  She is.

21             THE COURT:  So I understand the concern you have

22   is that if your employers learn about your conviction,

23   they might decide to terminate.

24             THE DEFENDANT:  R.I.S. does know.

25             THE COURT:  R.I.S. does know, okay.

1            And so if the other two employers knew, where

2       you're spending the bulk of your time, it sounds like,

3       that might pose a problem for you, I know that.

4            THE DEFENDANT:  Certainly.

5            THE COURT:  So the concern I have, though, is to

6       the extent that there is a risk here, it's not clear to me

7       why that risk should fall on an innocent employer.  That's

8       my concern.

9            THE DEFENDANT:  And I understand your concern.

10      If you can hear, from my point of view, obviously prior to

11      this incident, I have a clean background.  It's not

12      something I go out looking to who I can rob.  And I have a

13      problem, and I'm seeking help with that.

14           And, you know, the past two years, two and a

15      half years, you know, my life has just been, you know,

16      agonizing downright thinking about this whole thing, how

17      this whole thing has happened.  It was very difficult to

18      live with it during the beginning part, during the

19      investigation part.  It was humiliating when the agents

20      went to my employers to, you know, investigate, interview,

21      question.  With R.I.S., they've been very supportive.

22      I've been with them in excess of 12 years.  And they've

23      been -- but throughout this process, I also lost two

24      bookkeeping clients from this mess that I got myself into.

25      And then obviously the day of the plea on October 26, you

1    know, the next day the press release went out and some

2    people did find out, some of my friends.  I lost a friend

3    from that as well.  And it was -- again, I never felt so

4    humiliated.  My name was literally -- I literally felt

5    like I was being dragged through the mud.  And, you know,

6    it's a lesson that -- it's hard for me to accept, you

7    know, being here today, standing in front of a judge after

8    being on this earth for 58 years.

9             THE COURT:  Thank you very much, sir.

10             THE DEFENDANT:  Thank you.

11             MR. THOMAS:  Thank you.

12             THE COURT:  Thank you, Mr. Thomas.

13             Government.

14             MR. SHELDON:  Thank you, Your Honor.

15             As we stated in our sentencing memorandum --

16             THE COURT:  Do you mind coming on up?  If you

17    don't mind, thanks.

18             MR. SHELDON:  Sure.

19             As we said in our sentencing memorandum,

20    Your Honor, in this case the government's chosen not to

21    advocate for a particular sentence.  Nothing I say here

22    today should be construed as contrary to that.  But I did

23    want to discuss briefly how this case unfolded.

24             As set forth in the Presentence Report and in

25    our sentencing memorandum, in the course of the government

1   agents investigating some suspicious financial activity,

2   they interviewed the defendant and he admitted that he had

3   withdrawn hundreds of thousands of dollars from his

4   employer's account without authorization.  This conduct

5   was apparently driven by a compulsive gambling habit and

6   the investigation took steps to verify that, and I think

7   we assured ourselves that that was the cause of what was

8   going on.

9           In the course of our investigation before the

10   decision to file any charges, we met with the defendant's

11   previous attorney, and he asked us to meet with a

12   therapist who counsels people with gambling addiction.  We

13   talked about that.  She told us that when someone has a

14   gambling addiction, it actually activates the same center

15   in the brain that's affected when people are addicted to

16   opioids or other drugs.  It's not much different from a

17   heroin addict who is seeking that high or that sensation

18   of the drug.

19           We discussed the argument that was made that

20   people who are addicted shouldn't be prosecuted merely for

21   being an addict.  And for our part, the government raised

22   the point that generally, I hope in this day and age,

23   people aren't prosecuted for being addicts.  But if an

24   addict starts to affect other people's safety, the safety

25   of the community, or harm other people, then I think the

1    criminal authorities have to step in.  If an addict is

2    breaking into people's homes and stealing things or

3    robbing convenience stores, then criminal prosecution is

4    warranted to help protect the community from harm and

5    ultimately to protect the person suffering from the

6    addiction from harming him or herself.

7         At the time that we met with the gambling

8    counselor, we were told that the defendant had ceased

9    gambling and had excluded himself from all gambling

10   operations in the state.  And we learned that that was not

11   the case.  We had verified that his activity at

12   off-track-betting parlors had continued and continued

13   consistently.  So there was no question in our mind that

14   at that point the defendant's behavior had harmed other

15   people, chief among them of course is Mr. Altman.  We

16   should all be so lucky to have a friend or an employer

17   like Mr. Altman with whom we might make a mistake or cross

18   harm.

19        In determining how to proceed in this case, we

20   talked to Mr. Altman on several occasions to discuss what

21   had happened, what he wanted to see would be done.  He was

22   appreciative of those efforts.  I think it's fair to say

23   he supported and understood our decision to file charges

24   if, for no other reason, than to stop Mr. Chan from

25   continuing to harm other people.

 1            THE COURT:  And he is not, as I understand it,

 2    looking at his letter and other descriptions of his

 3    position, is he didn't specifically request that a charge

 4    be based upon the embezzlement from him.

 5            MR. SHELDON:  That's exactly right.  We talked

 6    about different options.  We talked about a tax charge as

 7    opposed to that.  And I think certainly I decided,

 8    exercising my prosecutorial discretion based on what he

 9    said, that a tax charge would be preferable.  I think he

10    supported that decision.

11            THE COURT:  And he's also not put in a request

12    for restitution.

13            MR. SHELDON:  Correct, Your Honor.  We've spent

14    a lot of time talking to him about how federal restitution

15    works and how it would operate and the various options,

16    made him aware he could come in here and discuss it with

17    Your Honor.  And he ultimately decided not to avail

18    himself.  We talked to him and his bookkeeper, and Special

19    Agent Cook and I spent some time with them.

20            THE COURT:  So ordinarily -- this is an unusual

21    case because ordinarily the Mr. Altmans of the world are

22    sitting right behind the prosecution and essentially

23    talking about the harm that's been experienced by them in

24    a way that's different than Mr. Altman.  I credit

25    Mr. Altman.  I think that the sentence I would impose is

1  going to be very different than if Mr. Altman had had a

2  different view here, because I think that part of the

3  criminal justice system is to respect the views of the

4  victims, give them due consideration, the views are not a

5  veto on what the prosecution does or certainly what the

6  Court does.  But I think that is significant here and I

7  understand his position on that.

8           Ordinarily, when there's been sort of an

9  underlying fraud or an embezzlement and a tax offense

10 there, I think the statutes provide that priority for

11 restitution purposes usually goes to, you know, the "real

12 victim," no offense to the IRS.

13           MR. SHELDON:  To the private victim.

14           THE COURT:  So in a way, because of the anomaly

15 that there's not a charge that's based on that or even a

16 request for restitution in terms of a court order of

17 restitution, I understand there's a separate agreement,

18 what will prevent or limit this order of restitution that

19 I would enter today from essentially crowding out

20 Mr. Chan's obligations to keep paying Mr. Altman?

21           MR. SHELDON:  That's something we've thought

22 about quite a bit, Your Honor.  I've gone back to the IRS

23 on numerous occasions and expressed my concern that the

24 private victim, Mr. Altman, should receive priority.  And

25 I can't, of course, speak for the entire Internal Revenue

1    Service, every time I went back I was assured that they

2    would recognize that.  They would recognize that loan

3    agreement that he signed as a preexisting debt in terms of

4    crafting any civil remedies or deciding to pursue civil

5    remedies.  I think also in this day and age the IRS is

6    vastly shrunken in its size so it has to determine where

7    it's going to put resources in terms of collectible cases.

8    As a practical matter, although can never say with

9    certainty, it may not be the kind of case that they spend

10   a lot of time on.  They have the right, certainly, to

11   pursue civil restitution regardless of what Your Honor

12   does.

13           But to get to the point of answering your

14   question, I think we can tailor restitution here to the

15   IRS in a way that acknowledges that the debt to Mr. Altman

16   should be superior to the amount paid to the IRS.

17           THE COURT:  So what should I say then?  Should a

18   condition then be -- basically, the restitution order be

19   made conditional upon repayment of obligations to

20   Mr. Altman?

21           MR. SHELDON:  You could certainly do that,

22   Your Honor.  Or you could say a lower set amount to be

23   paid to the IRS each month.  And the IRS, at least for

24   criminal purposes, would be bound by that.

25           THE COURT:  I see.  That's helpful.  Okay.

1          MR. SHELDON:  I do think the repayment schedule

2    to Mr. Altman is fairly ambitious if you look at it,

3    especially in light of other obligations the defendant

4    has.  I wish him luck.  I hope he does --

5          THE COURT:  What is the payment?

6          MR. SHELDON:  It's attached to our sentencing

7    memorandum.

8          THE COURT:  If you would remind me.

9          MR. SHELDON:  It starts at about $1700 a month

10   and then it goes up.  And it lasts through 2038.  The

11   payments are about $2600, $2700 a month.

12         Now, of course I don't have any sense at all

13   from Mr. Altman about how regularly those payments are

14   being made.  That's certainly what he agreed to provide.

15         We talked about the enforceability of

16   restitution compared to the enforcement of this agreement.

17   Mr. Altman thought about it quite a bit, talked to us

18   quite a bit, and decided to stay with his private

19   agreement with the defendant.

20         THE COURT:  So in a way, then, if I make the

21   restitution order to the IRS a conditional one upon

22   satisfaction of the full amount due to Mr. Altman, since

23   the agreement is he doesn't have to pay Mr. Altman in full

24   until 20 years from now --

25         MR. SHELDON:  You may crowd out essentially --

1    now, like any other creditor, the IRS has civil recovery

2    ability.  We're not precluding that.  But as a practical

3    matter --

4            THE COURT:  I get it.  Thanks.

5            MR. SHELDON:  In addition to Mr. Altman, of

6    course, there are other people who were harmed.  We

7    describe those in our sentencing memo.  And those other

8    victims -- I use that term in the vernacular lay term

9    rather than in the formal statutory sense a victim -- they

10   included the defendant's own family.  Some of those people

11   who were harmed still feel favorable towards Mr. Chan.

12           In our sentencing memorandum, we mentioned an

13   elderly resident of Long Island who had lent the defendant

14   $64,000.  That's Mr. Cantale who is identified in the

15   defendant's sentencing memorandum as writing a letter on

16   his behalf.  So he's fortunate to have such steadfast

17   friends.

18           We determined that if we didn't take steps, if

19   we didn't initiate criminal prosecution, the defendant was

20   likely to continue to harm others and harm himself.

21           Criminal prosecution is a blunt tool.  If

22   successful, it results in a felony conviction.  The

23   conviction presents the possibility of incarceration or

24   supervision by the Court.  I suppose in rare cases

25   complete release, but that's not what usually happens.  So

1    the choice truly boils down to incarceration or some form

2    of supervision, even if that supervision does carry some

3    restrictions on the liberty that the defendant would have.

4          The defendant brought this upon himself.  He

5    appears before this Court based on his own actions.  He

6    faces potential incarceration either in this sentence here

7    today or if he fails to comply with the Court's

8    supervision.  And he should recognize that fact.

9          We, on the government side, feel very strongly

10   that if we hadn't instituted prosecution, Mr. Chan would

11   almost surely be gambling today.  We recognize the fact of

12   conviction has collateral consequences on him for his

13   employment.  But to some degree, future employers should

14   be made aware of Mr. Chan's pathology of his addiction.  I

15   think it's analogous to a nurse or other medical

16   professional who might develop an addiction to opioid

17   medication and ends up stealing opioids from her employer

18   and using them or diverting them and distributing them on

19   the street.  Future employers should be aware of that

20   addiction so that at least initially when the nurse

21   arrives to work she doesn't have unlimited or unsupervised

22   access to the medication.  And as she recovers in her

23   recovery and builds greater trust, then maybe the employer

24   will take that into account.  But surely if only to

25   protect that nurse herself, let alone the community,

1    employers should be made aware of someone's strong

2    addiction and past.  I hope that in today's society we

3    recognize what addiction is, we recognize it as a form of

4    mental illness, and acknowledge that people do their best

5    to struggle with it.  But it also does pose a risk not

6    only to the addict, but to others around him or her.  And

7    for that reason, the proposed condition of supervision

8    that the Probation Office suggested is a good one.  I

9    think Your Honor's colloquy with the defendant and defense

10    counsel makes that clear.

11            THE COURT:  Probation is proposing something a

12    bit different.

13            MR. SHELDON:  They did.  They proposed a

14    conditional one, that if they thought that there was a

15    reason to notify, they would come to Your Honor and with

16    Your Honor's approval they would --

17            THE COURT:  But Mr. Thomas says that's so vague

18    and he raises a number of other concerns leaving

19    discretion to the Probation Office.  So I'm going to --

20    what I intend to do is put an order or a proposed order on

21    the docket in the case and to hear from the parties about

22    that promptly.

23            MR. SHELDON:  I think that's a wise step,

24    Your Honor.

25            I have to say, I was concerned when I read the

1    Presentence Report and learned that Mr. Chan still had not

2    informed his current employer of his conviction.

3              THE COURT:  He has not informed two of the

4    three.

5              MR. SHELDON:  The R.I.S. employer is the hotel

6    that we mentioned in our sentencing memorandum that we

7    contacted to assure ourselves there was nothing improper

8    in the books.  So they were aware of it through our

9    investigation.

10             Surely that information is better coming from

11   the defendant informing his employer than it is them

12   reading about it in the paper.  Your Honor discussed about

13   how this pathology led him to conceal his illness and his

14   conduct from his family and his prior employers.  I think

15   what we're dealing here is that initial instinct: I don't

16   want people to know, I feel a little bit of shame.  He

17   mentioned he felt shame from the fact that it's a public

18   fact that he's convicted.  Well, that is part of the

19   effect of his crime and the effect of his addiction.  He

20   really should be notifying his employers.  He's much

21   better off bringing it to their attention and explaining.

22   If they learn about it through press or other means,

23   they're going to think he concealed it from them and

24   wasn't fully honest and forthcoming.  So I do think it's

25   important that his employers receive notification.  And I

1    hope he'll do that without even a condition from the

2    Court.

3         As we stated in our memorandum, in most cases

4    some period of incarceration for a tax offense is

5    warranted as a matter of general deterrence, as a means of

6    ensuring full compliance, and making sure that our fellow

7    citizens who pay their taxes, they may grit their teeth

8    when they do it, but they pay their taxes because they

9    have faith that there's going to be serious consequences

10   if they fail to do so and that people who avoid taxes are

11   going to be sanctioned.

12        Should the Court impose a sentence of probation,

13   Mr. Chan should understand he's getting a break and a heck

14   of a second chance.  He has the opportunity to show the

15   Court and maybe his employers that he can control his

16   addiction.  We've suggested some conditions in our

17   sentencing memorandum that should assist the defendant

18   getting his life back in order.

19        I will note that the defendant has excluded

20   himself, certainly based on representations, from legal

21   gambling operations.  Your Honor raises the prospect of

22   internet gambling.  There's also, of course, the potential

23   of illicit gambling.  We all know those places exist.

24   They certainly exist for wagering on horse races, which is

25   what the defendant did.  We would urge the Court and the

1    Probation Office to closely supervise Mr. Chan and his

2    financial circumstances to make sure he doesn't end up in

3    a darker place than he was that led him to this point

4    today.  Thank you.

5              THE COURT:  Thank you, Mr. Sheldon.

6              MR. THOMAS:  One thing I didn't say.  Yes, I

7    agree with the government's point about the illicit

8    gambling, that is a possibility.  I just want to point out

9    that the best way to kind of mitigate against that is what

10   we're proposing as a sentence, as opposed to sending him

11   to prison where there is a much higher chance of relapse.

12   And I think that is very similar to drug addicts that end

13   up being sent back to prison.  It's this continuity of

14   care that's important.  And it's no guarantee, but it's

15   the best alternative.

16              That's all, Your Honor.

17              THE COURT:  Thank you.

18              I'm going to take a brief recess to consider all

19   I've heard and then return to impose sentence.  Thank you.

20              (Whereupon, a recess followed.)

21              THE COURT:  We're ready now to turn to the

22   imposition of sentence.

23              I realized I think when I asked you, Mr. Chan,

24   about whether you had reviewed and discussed the

25   Presentence Report with your counsel, I meant to also ask

1    whether you reviewed the addendum to the Presentence

2    Report and discussed it with your counsel.  Did you do so,

3    sir?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Thank you.

6              So Mr. Chan, before I impose sentence, I want to

7    talk to you about what I'm required to think about or

8    consider in the context of anybody who faces sentencing.

9              Of course, I have to think about what it is you

10    did wrong that brings you into court.

11              I also have to think about the rest of you as a

12    person in terms of your personal background, your growing

13    up, which I've learned about, the successes that you've

14    had, particularly in employment area, with your family as

15    well.

16              I have to consider all of what I know about you

17    in light of the purposes of sentencing, and you've heard

18    me talk a little bit about that in terms of what is a just

19    punishment, what will promote public safety, what will

20    deter not only you but others from engaging in similar

21    kind of criminal conduct.  Rehabilitation, that's

22    obviously important in light of your gambling disorder.

23              And then I also have to think about what the

24    Sentencing Guidelines recommend, and we've talked about

25    that as well.  It's technical in nature, but I do give due

1  consideration to what the Sentencing Guidelines would

2  recommend.

3       I have to also think about the need to avoid

4  unwarranted differences in the sentence that I might

5  impose and the sentence somebody else pretty much in the

6  same circumstances as you would receive.

7       And I have to think about the need to provide

8  restitution to people who have been harmed by the offense.

9       Basically, I have to think about everything I

10  know about you, both the "good" and the "not so good," and

11  to decide upon a sentence that's fair and just and

12  reasonable, also one that's not greater than necessary to

13  serve those purposes that we talked about of sentencing.

14       I've tried to do that in your case.  What stands

15  out in my mind is you essentially succumbed or gave in to

16  a weakness that you knew you had long had with respect to

17  gambling.  It ruined your first marriage and you had that

18  challenge.  You ended up giving in to it so that it seized

19  you and took control of you.  And you took a large amount

20  of money, I think by anybody's standards, from your

21  employer, Mr. Altman.  And in the course of that, of

22  course you didn't declare that money on your tax returns

23  and you face this prosecution for that tax return, a

24  prosecution, however, that's very dependent on the fact

25  that you acquired this money unlawfully in the first

1    instance.  That's the not-so-good side.

2              On the other side of the coin is the fact that

3    you do have an impressive record of employment, of

4    building a career, of building a family, of in this case

5    doing a lot on your own to repay.  There are many people

6    who come into court who take other people's money and they

7    don't really make a serious effort to repay.  You've made

8    a very serious effort to repay and to make good on that,

9    and I'm impressed by that because it hasn't just been

10   words for you, it's actually been actions that you've

11   taken to try to repay people that you've taken money from.

12             I'm influenced, as I said before, by the fact

13   that you, notwithstanding the challenges you've had, you

14   do inspire loyalty in others.  You inspire it from your

15   wife, clearly, and I appreciated the letter she wrote to

16   the Court.  You inspire it even from people you've taken

17   money from, as Mr. Thomas pointed out and Mr. Sheldon

18   pointed out, which is a mitigating factor, in my view,

19   because they're the ones closest to the concerns that

20   bring us here to court.  And the fact that Mr. Altman has

21   taken the position that he has with respect to not asking

22   me to impose a condition of incarceration is very

23   important to me here in this context.

24             So I just ask you, because you got up and you

25   told me about the humiliation that you face, that you have

1    faced and you may continue to face, I want you to imagine

2    for a moment the humiliation that Mr. Altman faces or

3    somebody who has money stolen from them also faces.

4    That's another kind of humiliation.  And you just can

5    never let any kind of urge to gamble allow you to have

6    victims like that, as Mr. Sheldon talked about, again.

7    Because the harm that they face, no matter how magnanimous

8    they are, as Mr. Altman is, it's an immense one that they

9    face.  By equal measure, at least as much as the

10   humiliation and harm that you face from having to go

11   through the criminal process.

12          So all in all, as I look at everything here, I'm

13   persuaded by your counsel's very able recommendation here

14   to impose a sentence of probation, particularly in light

15   of the choice that I have between imposing a sentence of

16   incarceration that would be followed by a term of

17   supervised release of only one year versus a longer term

18   of probation, I'm convinced that it's better to have a

19   longer term of engagement with you to make sure that you

20   have fully righted the ship and are going off in the right

21   direction.  So I'm going to impose a sentence of probation

22   in your case -- you don't need to stand yet.  And I'm

23   doing that and vary down from what the Sentencing

24   Guidelines recommend for substantially the reasons stated

25   by Mr. Thomas in his sentencing memorandum.

1            At this time I'll have you stand, sir, for

2   purposes of imposing sentence.

3            Mr. Eddy Chan, for the purposes I explained, I'm

4   imposing the following sentence of five years of

5   probation.

6            I am not going to impose a criminal fine in

7   light of the restitution obligations that you have.

8            I am going to impose an order of restitution to

9   the Internal Revenue Services, agreed to in the plea

10  agreement, of $78,214.  That order, however, is

11  contingent, conditioned on your having fully paid

12  Mr. Altman the amounts that you owe to Mr. Altman.  And

13  if, for some reason, financial circumstances change in

14  some manner that the government becomes aware of, would

15  seek reconsideration of the contingent aspect of the

16  restitution order, the Court will happily consider that

17  information if for some reason you acquire a lot of money,

18  not through gambling, of course, but acquire a lot of

19  money, could pay more restitution on a speedier basis than

20  that.

21           I'll also impose the $100 special assessment

22  that I'm required to do.

23           I'm going to impose a number of very detailed

24  conditions.  And I'm going to have you sit down for this,

25  because it's going to take me a while to review them and

1  I'll answer any questions that you have about it.

2           During the term of your five years of probation,

3  you'll not commit another federal, state, or local

4  offense.

5           You shall not unlawfully possess a controlled

6  substance.  You shall refrain from any unlawful use of a

7  controlled substance and submit to a drug test within 15

8  days of release, and at least two periodic drug tests

9  thereafter for use of a controlled substance.  I think

10  that the use of controlled substances is something in your

11  past, but there's some indication of that that I have in

12  the record here, that's why I'm imposing those conditions.

13           You will also be required to cooperate in the

14  collection of a DNA sample as required by the law.

15           I'll also impose the standard conditions set

16  forth in the Sentencing Guidelines of probation.

17           In addition, the following special conditions:

18           That you must produce the probation officer

19  access to any requested financial information and

20  authorize the release of any financial information, and

21  the Probation Office may share that financial information

22  with the United States Attorney's Office.

23           I'll require that you not incur any new credit

24  card charges above $500 or open any additional lines of

25  credit without the approval of the probation officer.  You

1     must not add any new names to any lines of credit, and you

2     must not be added as a secondary cardholder on another

3     person's line of credit.  You know the concern there would

4     be if, for some reason, gambling took hold again of you,

5     you could go into credit cards.

6            You must cooperate with the Internal Revenue

7     Service to pay all outstanding taxes, interest and

8     penalties, subject of course to the contingent restitution

9     obligation I've imposed.  Of course you shall file lawful

10    and timely tax returns and provide copies during the

11    five-year term of your probation to the Probation Office.

12            I'll require, perhaps most importantly of all,

13    that you participate in a gambling addiction treatment

14    program and you follow the rules and regulations of that

15    program.  As you and your counsel have acknowledged,

16    gambling is something that doesn't go away easily, so it's

17    going to be very important throughout the term of

18    probation for you to keep full attention to doing that.

19    If for some reason you have financial resources, I don't

20    expect that you would, but if you had financial resources,

21    you would be required to pay all or a portion of the cost

22    of the gambling treatment program.  To the extent that you

23    don't, and I assume you probably will not, the Probation

24    Office would finance a gambling program.

25            The next condition is that you not engage in any

1   form of gambling including, but not limited to, lotteries,

2   online wagering, sports betting.  And you must not enter

3   any casino or other establishment where gambling is the

4   primary purpose.  And I include among those horse

5   racetracks, off-track betting establishments as well.

6           Those are the conditions of probation.

7           You've heard me talk a lot about notification to

8   your employer.  I'm not going to impose that condition at

9   this time simply because I want to give you an opportunity

10  to respond further to that condition insofar as that

11  specific condition, as I've suggested that I'm

12  contemplating imposing, which would essentially be direct

13  notification by the Probation Office to any employer that

14  you may have, any employer for whom you may work in a

15  financial-related capacity, of the fact of conviction and

16  the associated documentation.  I want to give an

17  opportunity to you to object to that or to raise any other

18  concerns that you might have about that notification, but

19  you know I do have that concern.  So I will post on the

20  docket today, I anticipate, a copy or a text of that

21  proposed order and invite the parties to submit any kind

22  of response to that or objection to that within seven

23  days.

24          Okay.  So that's the sentence that the Court is

25  imposing.

1           I'll ask all parties, is there any reason why

2    the Court cannot lawfully impose the sentence and the

3    conditions I've imposed?

4           MR. SHELDON:  No, Your Honor.

5           MR. THOMAS:  No, Your Honor.

6           This may be a moot point, but with respect to

7    the restitution, I understand that it's contingent on the

8    payment to Michael Altman, but in the event that he does

9    pay him, I would ask that the interest and penalties be

10   waived on the contingent restitution.  I don't know if

11   necessarily --

12          THE COURT:  I'm not sure how to --

13          MR. SHELDON:  It's within the Court's authority

14   certainly to waive.

15          THE COURT:  I don't usually impose the interest

16   and penalties as part of that.  I know the IRS civilly can

17   pursue that, but usually I just impose a particular dollar

18   number.  And I think I'll tend to do that.  It seems like

19   an academic issue in light of the financial issues.

20          MR. THOMAS:  Exactly.

21          THE COURT:  Any other reason why the Court

22   cannot lawfully impose the sentence or any of the

23   conditions I've imposed?

24          MR. THOMAS:  No, Your Honor.

25          THE COURT:  The judgment of the Court will be

1   prepared for my approval by the Clerk's Office.

2           Mr. Chan, you do have the right to appeal your

3   conviction and sentence.  It may be limited in some sense

4   by your plea agreement, but to the extent that you do have

5   a right to appeal, you would need to do so within the next

6   14 days or you'd lose that right to appeal.  And if you

7   could not afford counsel, you'd have counsel appointed to

8   represent you for appeal.  Do you understand all of that,

9   sir?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Is there anything else to take up at

12  this point?

13          MR. SHELDON:  No, Your Honor.  Thank you.

14          MR. THOMAS:  No, Your Honor.

15          THE COURT:  Thank you all.  We'll stand

16  in recess.

17              (Proceedings adjourned at 11:27 a.m.)

18

19

20

21

22

23

24

25

1

2

3                        C E R T I F I C A T E

4

5        RE: UNITED STATES OF AMERICA v. EDDIE CHAN

6                    No. 3:17CR234(JAM)

7

8            I, Diana Huntington, RDR, CRR, Official Court

9    Reporter for the United States District Court for the

10   District of Connecticut, do hereby certify that the

11   foregoing pages 1 through 47 are a true and accurate

12   transcription of my shorthand notes taken in the

13   aforementioned matter to the best of my skill and ability.

14

15

16

17

18                    _____ /s/ _____

19                    DIANA HUNTINGTON, RDR, CRR
                      Official Court Reporter
20                    United States District Court
                      141 Church Street, Room 147
21                    New Haven, Connecticut 06510
                      (860) 463-3180
22

23

24

25